

**FILED**
Apr 28 2015, 9:20 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Patrick J. Murphy
State Farm Litigation Counsel
Indianapolis, Indiana

ATTORNEY FOR APPELLEE

John C. Theisen
Nathaniel O. Hubley
Theisen & Associates, LLC
Fort Wayne, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

Dawn Warrick and Nathan
Parrish,

*Appellant-Defendants,*

v.

Steve and Mitzi Stewart,

*Appellee-Plaintiffs*

April 28, 2015

Court of Appeals Case No.
92A03-1407-CC-257

Appeal from the Whitley Circuit
Court
The Honorable James R. Heuer,
Judge
Cause No. 92C01-1111-CC-694

**Bailey, Judge.**

# Case Summary

Steve Stewart ("Stewart") brought a negligence claim against Dawn Warrick ("Dawn") and Nathan Parish ("Nathan") (collectively, "the Warricks") after Stewart's motorcycle collided with the Warricks' loose dog, causing Stewart to suffer personal injury.[1]  A jury found that Stewart was seventy percent at fault and accordingly returned a verdict for the Warricks.  After Stewart filed a motion to correct error, the trial court granted the motion, set aside the jury's verdict, and ordered a new jury trial.  We affirm.

# Issue

The Warricks present one issue for review: whether the trial court abused its discretion when it granted Stewart's motion to correct error, set aside the jury's verdict as against the weight of the evidence, and ordered a new trial.

# Facts and Procedural History

At approximately 11:00 a.m. on October 11, 2010, a clear and dry morning, Stewart was driving his motorcycle south on Main Street in Columbia City, Indiana.  After stopping for a red light at the corner of Main and Chicago Streets, Stewart turned left and headed east on Chicago.  On his right, Stewart noticed a pickup truck beginning to exit the corner gas station onto Chicago.

---

[1] Stewart's wife, Mitzi Stewart, also brought a claim for loss of consortium.

Concerned that the truck was going to pull out in front of him, he slowed down. When the truck driver braked and acknowledged Stewart, Stewart accelerated and continued east on Chicago. Stewart was looking forward, and in his peripheral vision, he did not see any cars coming from Whitley Street on his left.

[4] Seconds later, a dog darted into the street and collided with Stewart's motorcycle. He never saw the dog. Stewart gave conflicting testimony as to how many seconds elapsed between the time he braked for the truck and the time he hit the dog, but estimated his speed on impact as twenty-two to twenty-three miles-per-hour. He lost control of the bike, his helmet hit the pavement, and the motorcycle slid 102 feet to a stop. As a result of the crash, Stewart suffered injuries to his shoulder, collarbone, back, leg, and foot.

[5] Christopher LaRue ("LaRue") was driving a pickup truck about one hundred feet directly behind Stewart. From his vantage point, LaRue saw a dog, "running fast for a dog" (Tr. 157), dart out from behind a small concrete wall on the right side of the road and into Stewart's path. LaRue estimated that Stewart was traveling twenty miles-per-hour when he hit the dog. When asked whether LaRue thought Stewart could have done anything to avoid the collision, LaRue opined that "if I would have been on a motorcycle, I would have hit the dog." (Tr. 157.)

[6] Columbia City Police Officer Peter Yorg ("Officer Yorg") investigated the accident. Officer Yorg described the circumstances contributing to the crash as

"the fact that the dog ran out in front of . . . the motorcycle and . . . the motorcycle . . . struck the dog and caused him to lose control." (Tr. 174.) Officer Yorg's investigation did not lead him to conclude that Stewart was at fault in any way.

[7] At the time of the crash, Nathan was inside the Chicago Street home he shared with his mother, Dawn. The Warricks had recently acquired two dogs, one for each of them, which they kept inside the house. The Warricks did not have a fence around their property; thus, when they let the dogs outside, they restrained each dog in the backyard using a cable that attached to a yard stake on one end and the dog's collar on the other. On the morning of the crash, Nathan let the dogs outside on their staked cables. Shortly after, Nathan heard the accident commotion outside. After discovering Dawn's dog at the crash site, Nathan walked to the backyard where he found the escaped dog's collar still clasped shut and attached to the staked cable; apparently, the dog had slipped the collar.

[8] At trial, Dawn testified that she had fitted a new collar on the dog one week before the accident. However, Dawn admitted that the dog, which had obviously slipped out of the collar just before the crash, was not "properly restrained" and was "at large" in the city limits, in violation of Columbia City Ordinance section 90.03(K). Stewart's dog training expert, Michael Rowland, Jr. ("Rowland") testified that the collar was in good working order and the appropriate size for the dog. However, based on his review of the evidence, the only way the collar could come over the dog's head was if the collar was

improperly fitted. Rowland testified that the breed's "head size is so much bigger than that area in the neck where [the collar] should be fitted, that it would be physically impossible for the dog to pull a properly fitted collar over its head." (Tr. 219.)

[9] Stewart filed a negligence claim against the Warricks on November 30, 2011, alleging that the Warricks were negligent in failing to restrain and supervise the dog and that their negligence was the cause of the crash and Stewart's personal injuries. On May 14, 2014, at the conclusion of a two-day jury trial, the jury assigned seventy percent fault to Stewart and thirty percent fault to the Warricks. Because the jury found Stewart more than fifty percent at fault, the trial court entered judgment in favor of the Warricks.

[10] Stewart then filed a motion to correct error, on which the court heard argument on June 19, 2014. (Tr. 364.) On June 25, 2014, the trial court granted Stewart's motion to correct error, set aside the jury's verdict as against the weight of the evidence, and granted a new trial. The Warricks now appeal.

# Discussion and Decision

## Standard of Review

[11] Indiana Trial Rule 59 governs motions to correct error. Rule 59(J) provides that if a court determines that prejudicial or harmful error has been committed, the court shall take such action as will cure the error, including, among other possible remedies, granting a new trial. T.R. 59(J)(1). Further:

(7) In reviewing the evidence, the court shall grant a new trial if it determines that the verdict of a non-advisory jury is against the weight of the evidence; and shall enter judgment, subject to the provisions herein, if the court determines that the verdict of a non-advisory jury is clearly erroneous as contrary to or not supported by the evidence . . . .

T.R. 59(J)(7).

Once the trial court has granted a new trial, this Court will reverse that decision only for an abuse of discretion. *Barnard v. Himes*, 719 N.E.2d 862, 865 (Ind. Ct. App. 1999), *trans. denied*. An abuse of discretion occurs when the court's action is against the logic and effect of the facts and circumstances before it and the inferences that may be drawn therefrom. *Id.* The trial court's decision to grant a new trial is given a strong presumption of correctness. *Walker v. Pullen*, 943 N.E.2d 349, 351 (Ind. 2011). However, the strong presumption of correctness arises only if the trial court's decision is supported by the special findings required by Trial Rule 59(J). *Id.* at 352.

Under Trial Rule 59(J), when any corrective relief is granted, "the court shall specify the general reasons therefor." The rule also requires that, when a new trial is granted because the verdict does not accord with the evidence,

> the court shall make special findings of fact upon each material issue or element of the claim or defense upon which a new trial is granted. Such finding shall indicate whether the decision is against the weight of the evidence or whether it is clearly erroneous as contrary to or not supported by the evidence; if the decision is found to be against the weight of the evidence, the findings shall relate the supporting and opposing evidence to each issue upon which a new trial is granted; if the decision is found to be clearly erroneous as contrary to or not supported by the evidence, the findings shall show why judgment was not entered upon the evidence.

T.R. 59(J). Our supreme court has explained the purpose of the rule and the special findings:

> The purpose of authorizing the trial judge to grant a new trial, when the judge considers the verdict to be against the weight of the evidence, is to erase the occasional unsupportable jury verdict. It is to supplant that which is irrational with something that is rational. An order of court can fulfill this extraordinary and extreme function only if it is based upon a complete analysis of the relevant facts and applicable law, and sets out on paper the constituent parts of that analysis. It is compliance with the arduous and time-consuming requirements of the Rule which provides assurance to the parties and the courts that the judge's evaluation of the evidence is better than the evaluation of the jury.

*Nissen Trampoline Co. v. Terre Haute First Nat'l Bank*, 265 Ind. 457, 464-65, 358 N.E.2d 974, 978 (1976)). Thus, strict compliance with the substantive and procedural requirements of Trial Rule 59(J) is of "paramount" importance. *Id.* at 464.

# Discussion

[14]   In its order containing specific findings, the trial court concluded that a jury verdict assigning seventy percent fault to Stewart for his role in the collision was against the weight of the evidence.[2] The court also noted that "[a] verdict that

---

[2] The trial court also made findings regarding the Warricks' duty to restrain the dog. The court concluded that "[i]f the verdict of the jury was that Stewart was 70% at fault with respect to the dog getting loose, . . . the verdict is not just against the weight of the evidence, but . . . is clearly erroneous as contrary to and not supported by the evidence admitted at trial." (App. 10-11.) On appeal, the parties agree that the trial court did not abuse its discretion when it concluded that there was no evidence that Stewart was at fault for the dog escaping.

assigned a minimal percentage of fault to Stewart for failure to maintain a proper lookout would not be set aside." (App. 13.) Because under the evidence presented it was "conceivable that [Stewart] be assigned minimal percentage of fault[,]" the court ordered a new trial. (App. 13.)

[15] On appeal, the Warricks argue that the trial court's grant of a new trial was an abuse of discretion because 1) the court's special findings regarding Stewart's speed were not supported by the evidence and were contrary to law, 2) the court's written findings were inconsistent with the court's decision to grant a new trial, and 3) the court gave the jury instructions on comparative fault but then decided on the motion to correct error that the evidence supported an allocation of only minimal fault to Stewart. We examine each of these arguments in turn.

### Stewart's Speed

[16] The trial court found that "[a]ll of the evidence admitted at trial indicated Stewart was not speeding but was traveling under the speed limit." (App. 12.) The Warricks argue that the trial court did not give sufficient weight to, or completely ignored, certain evidence related to Stewart's speed. They argue that the court abused its discretion because only by improperly weighing or overlooking the evidence could the court have concluded that Stewart was not speeding and therefore only minimally at fault.

[17] The Warricks do not dispute that both Stewart and LaRue testified at trial that Stewart was driving under the speed limit at the time of the crash. Rather, they

argue that Stewart's deposition testimony, in which he only stated that his speed was under thirty miles-per-hour (not specifically twenty-two or twenty-three, as he stated at trial), and LaRue's admission on cross-examination that he was driving, talking on his cell phone, and communicating with a passenger at the time he observed the accident and Stewart's speed, sufficiently undercut the reliability of their testimonies such that the court could not have concluded that Stewart was driving the under the speed limit.

[18]   The Warricks' argument regarding the reliability and credibility of eyewitness testimony goes to the weight of the evidence. When considering whether to grant a new trial, "the trial judge has an affirmative duty to weigh conflicting evidence." *Mem'l Hosp. of South Bend v. Scott*, 261 Ind. 27, 33, 300 N.E.2d 50, 54 (1973). "The trial judge sits as a 'thirteenth juror' and must determine whether in the minds of reasonable men a contrary verdict should have been reached." *Id.* As the thirteenth juror, the trial judge 1) hears the case along with the jury, 2) observes witnesses for their credibility, intelligence, and wisdom, and 3) determines whether the verdict is against the weight of the evidence. *Precision Screen Machs., Inc. v. Hixson*, 711 N.E.2d 68, 70 (Ind. Ct. App. 1999). On appeal, this Court "cannot assume the responsibility of weighing conflicting evidence[.]" *Scott*, 261 Ind. at 33.

[19]   Here, there was testimonial evidence that Stewart was not speeding. The court was able to assess the credibility of the witnesses during their testimony. The trial court's acknowledgement that "Stewart gave varying accounts as to how many seconds he traveled from the point of slowing down for a truck" to the

point of impact reveals that the court considered apparent inconsistencies in Stewart's testimony when making its decision. (App. 12.) Although the defense raised questions about the credibility of the witnesses, it was within the court's purview to make credibility determinations. And no evidence was presented that Stewart was speeding. We therefore cannot say that the court's conclusion that Stewart was driving under the speed limit was contrary to the evidence presented.

[20] The Warricks also argue the "trial court's outright rejection of the probative value" of the evidence regarding the distance the motorcycle slid from the point of impact to the point it stopped was contrary to law. (Appellant's Br. 8.) They contend that the court's alleged failure to consider this evidence runs contrary to our supreme court's holding in *Samuel-Hawkins Music Co. v. Ashby*, 246 Ind. 309, 205 N.E.2d 679 (1965). The court in *Ashby* held that, in the absence of direct testimony regarding a truck's speed prior to a collision, the length of skid marks leading to the collision site, distance traveled after impact, and force of impact were sufficient evidence for the jury to consider the question of whether the truck driver was traveling at a high and dangerous rate of speed. *Id.* at 312-13.

[21] We disagree that the trial court ignored the evidence of the motorcycle's slide length or its probative value. Rather, the court included two references to the evidence in its special findings. The court found and concluded:

> 21. Columbia City Police Officer Peter Yorg viewed the physical evidence, determined the point of impact and measured the distance

the motorcycle slid from point of impact to rest at 102 feet, and interviewed LaRue. Based on his training and everything he observed, Officer Yorg testified that the cause of the collision was the dog and that Stewart did not contribute in any way to causing the collision.

[. . . .]

25. The fact that the evidence showed the motorcycle slid 102 feet from point of impact to point of rest shows nothing that can be equated to fault on the part of Stewart. There was no evidence equating the 102 foot slide to any unlawful speed or other possible evidence of negligence.

(App. 12.)

[22] The special findings show that the trial court considered the evidence of the 102-foot slide in conjunction with Officer Yorg's testimony. The court also found that, absent further evidence equating the slide distance to an unlawful speed, the evidence offered little probative value for determining Stewart's speed at the time of the crash. Furthermore, as the thirteenth juror, it was the court's duty to weigh the evidence of the slide against the testimonial evidence about Stewart's speed. The Warricks now request that this Court reweigh the evidence, which we cannot do on appeal.

[23] The trial court did not abuse its discretion when it weighed the evidence presented regarding Stewart's speed and concluded that Stewart was not speeding.

### *Trial Court's Order*

[24] The Warricks next argue that the trial court made "incompatible determinations" regarding Stewart's fault for the collision and failure to maintain a proper lookout. (Appellant's Br. 10.) The Warricks point to the

court's findings that "there was no evidence at trial that Stewart should have seen the dog prior to the collision" and that "there was nothing he could do to avoid the collision." (App. 11, 12.) They argue that these findings are inconsistent with the court's ultimate decision that a new trial was appropriate because "it is conceivable that [Stewart] be assigned a minimal percentage of fault" due to failure to maintain a proper lookout. (App. 13.)

[25] We think the Warricks read the trial court's findings too selectively. In its special findings, the trial court reviewed both the supporting and opposing evidence. In addition to the evidence that Stewart was driving under the speed limit and LaRue's opinion that "if I would have been on a motorcycle, I would have hit the dog" (Tr. 157), the court noted "that just prior to the collision Stewart slowed down for a truck attempting to pull out of the Gas America, acknowledged the driver of the truck and then proceeded down the street." (App. 12.) The court acknowledged that Stewart gave "varying accounts" as to the number of seconds he traveled after braking for the truck and before the crash. (App. 12.) The court found an irregularity in Stewart's testimony and recognized that a reasonable fact finder could have drawn an inference that Stewart was distracted, at least at some point, by the truck. However, the court concluded that while it was "conceivable" that Stewart failed to maintain a proper lookout, the "discrepancies in his testimony could not, in any event, lead to the rational conclusion that Stewart was at 70% fault in the collision." (App. 12.)

[26] One purpose of the special findings required by Trial Rule 59(J) "is to provide the parties and the reviewing court with the theory of the trial court's decision." *DeVittorio v. Werker Bros., Inc.*, 634 N.E.2d 528, 531 (Ind. Ct. App. 1994). Based on the special findings, we understand the trial court's theory to be that the weight of the evidence demanded a greater allocation of fault to the Warricks for their negligence in improperly restraining the dog than to Stewart for his driving, even though Stewart may have been distracted at some point by another potential hazard on the road. There was ample evidence presented that the Warricks negligently failed to restrain the dog and that, but for their negligence, the dog would not have been in the path of Stewart's motorcycle in the first place. Give the "strong presumption of correctness" we afford the trial court's decision, *Walker*, 943 N.E.2d at 352, we cannot say, from our review, that the court abused its discretion when it set aside a jury verdict allocating more than fifty percent fault to Stewart. *See Barnard*, 719 N.E.2d at 867 (holding that trial court did not abuse its discretion when it set aside a jury verdict as against the weight of the evidence where the jury assigned only one percent fault to a driver who crossed the centerline and hit a second car in its lane of travel).

### Jury Instructions

[27] Finally, the Warricks argue that the trial court's assessment of the evidence on the motion to correct error, and Stewart's arguments in support of the motion, are "incongruous" with their actions at trial. (Appellant's Br. 11.) Specifically, they contend that, because the trial court concluded that the evidence supported

only a finding that Stewart was minimally at fault, the trial court should not have given a jury instruction on comparative fault and, in any case, Stewart should have objected to the instruction at trial in order to preserve his arguments on appeal. The Warricks argue, then, that the trial court's decision to set aside the jury's verdict after giving the comparative fault instruction amounts to an abuse of discretion.

[28] The Warricks cite no authority to support their position that a trial court abuses its discretion when it gives a jury instruction on comparative fault but, when asked to review the evidence on a motion to correct error, finds that the evidence supported assigning only a minimal percentage of fault to the plaintiff. This case squarely presented the issue of comparative fault, and it was appropriate for the trial court to present the instruction to the jury. Even though the trial court ultimately concluded that the jury's allocation of fault was not supported by the evidence, the question of the measure of Stewart's fault was properly before the jury. And as the court concluded, "[a] verdict that assigned a minimal percentage of fault to Stewart for failure to maintain a proper lookout would not be set aside." (App. 13.) Further, we observe that Stewart was not required to object to the jury instruction on comparative fault in order to preserve the issue and argument for the motion to correct error or appeal. *See Burton v. Bridwell*, 938 N.E.2d 1, 5-6 (Ind. Ct. App. 2010) (holding that plaintiff, who failed to object to a pattern verdict form that permitted allocation of fault to her, did not waive her right to challenge the allocation of

more than fifty percent fault to her on the basis of insufficient evidence where plaintiff filed a motion to correct error), *trans. denied*.

# Conclusion

[29] The trial court did not abuse its discretion when it granted Stewart's motion to correct error, set aside the jury's verdict as against the weight of the evidence, and ordered a new trial.

[30] Affirmed.

Riley, J., and Barnes, J., concur.